1  Eric J. Beste (SBN 226089)
   Eric.Beste@btlaw.com
2  Amy C. Poyer (SBN 277315)
   Amy.Poyer@btlaw.com
3  Mark Crandley (*pro hac vice forthcoming*)
   Mark.Crandley@btlaw.com
4  David A. Frazee (*pro hac vice forthcoming*)
   David.Frazee@btlaw.com
5  **BARNES & THORNBURG LLP**
6  655 West Broadway, Suite 1300
   San Diego, California 92101
7  Telephone:    (619) 321-5000
   Facsimile:    (310) 284-3894
8
   Attorneys for Plaintiff
9  PROFESSIONAL COMPOUNDING CENTERS
   OF AMERICA, INC.
10

**IN THE UNITED STATES DISTRICT COURT**

11
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| 13  PROFESSIONAL COMPOUNDING CENTERS OF AMERICA, INC., | |
| 14                *Plaintiff,* | |
| 15  *v.* | Case No.: 1:25-at-879 |
| 16  ANNE SODERGREN, Executive Officer of the California State Board of Pharmacy, JULIE ANSEL, | COMPLAINT |
| 17  Deputy Executive Officer of the California State Board of Pharmacy, SEUNG OH, President of the California | Declaratory and Injunctive Relief to Prevent Civil Rights Violations (42 |
| 18  State Board of Pharmacy, JESSICA CROWLEY, Vice President of the California State Board of Pharmacy, | U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202) |
| 19  TREVOR CHANDLER, Treasurer of the California State Board of Pharmacy, RENEE ARMENDARIZ, | |
| 20  Member of the California State Board of Pharmacy, KARTIKEYA JHA, Board Member of the California | |
| 21  State Board of Pharmacy, SATINDER SANDHU, Member of the California State Board of Pharmacy, | |
| 22  MARIA D. SERPA, Member of the California State Board of Pharmacy, NICOLE THIBEAU, Member of | |
| 23  the California State Board of Pharmacy, JEANETTE DONG, Member of the California State Board of | |
| 24  Pharmacy, JEFF HUGHES, Member of the California State Board of Pharmacy, CLAUDIA L. MERCADO, | |
| 25  Member of the California State Board of Pharmacy, JASON NEWELL Member of the California State | |
| 26  Board of Pharmacy, and RICARDO SANCHEZ, Member of the California State Board of Pharmacy, *all* | |
| 27  *in their official capacities*, | |
| 28                *Defendants.* | |

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

**INTRODUCTION**

1.      Plaintiff Professional Compounding Centers of America, Inc. ("PCCA") brings this urgent civil rights action to prevent the unconstitutional enforcement of regulations recently promulgated by the California State Board of Pharmacy ("the Board"). These regulations—which go into force on October 1, 2025—will unlawfully restrict PCCA's protected commercial speech and require PCCA to publicly disclose its confidential and sensitive trade secret information. PCCA and others have advised the Board that the regulations in question would not improve consumer safety or product quality, but would instead impose unconstitutional burdens on PCCA's free speech rights and unlawfully publicize PCCA's confidential commercial information. Despite the critical commentary provided by PCCA and others, the Board plowed ahead with promulgating regulations that it intends to enforce in an unconstitutional manner. Accordingly, PCCA has no choice but to bring this civil action against the members of the Board and its Executive Director (collectively, "Defendants") in their official capacities.

2.      Specifically, PCCA seeks injunctive and declaratory relief preventing Defendants from the unconstitutional enforcement of amendments to the Compounded Drug Preparations Regulations, specifically Title 16, Division 17, Articles 4.5, 4.6, 4.7 and 4.8 of the California Code of Regulations ("the Regulations"), which will be effective and enforceable on October 1, 2025. *See* Ex. A (excerpt highlighting relevant sections from the Regulation).

3.      The Regulations, as applied, prohibit a manufacturer such as PCCA from calling itself a "manufacturer." Specifically, the Regulations, as applied, force PCCA to remove its own name as the "manufacturer" from its Certificate of Analysis ("COA") and force PCCA to state another entity is the manufacturer—thereby compelling PCCA to make false, misleading, and controversial statements and representations about the identity of the "manufacturer" and the party that is responsible for the pharmaceutical ingredients PCCA sells. Government restriction of such truthful speech is a patent violation of the First Amendment to the United States Constitution.

4.      Moreover, as applied, the Regulations also violate the Fifth Amendment to the United States Constitution by effecting a regulatory taking. The Regulations, as applied, *require* PCCA to publicly disclose its confidential business information—that is, the carefully curated list

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1   of PCCA-approved sources of active pharmaceutical ingredients ("APIs") and other ingredients

2   that PCCA has developed over more than 40 years through substantial investment in due

3   diligence, facility audits, and quality control systems.  These sources are thoroughly vetted by

4   PCCA, but their identities are kept confidential. As such, this information constitutes proprietary

5   and commercially sensitive information, the disclosure of which is not required by federal or other

6   state regulators. Nor is the disclosure of this confidential commercial information necessary for the

7   safe use of APIs by pharmacy customers. This forced disclosure of PCCA's valuable confidential

8   information constitutes a taking of property without any (let alone "just") compensation, and

9   violates the Takings Clause of the Fifth Amendment to the Constitution of the United States.

10          5.       Defendants' threatened enforcement of the Regulations violates PCCA's

11  constitutional rights and serves no legitimate public health purpose. Although Defendants point to

12  the United States Food and Drug Administration ("FDA") in support of its Regulations, in fact, the

13  FDA does not require PCCA to disclose its confidential commercial information on its COAs or to

14  compounding pharmacies. Rather, the FDA accepts COAs that do not identify the companies from

15  which PCCA purchases APIs and other drug ingredients (the "Upstream Source"). Neither the

16  FDA nor any other state regulator has determined that such disclosure on the COAs used by

17  PCCA serves public health purposes. On this point, California stands alone.

18          6.       There is no legitimate public reason to force PCCA to affix false, misleading or

19  controversial information on its COA.  PCCA is a manufacturer, under California and federal law.

20  As the manufacturer shipping directly to pharmacy customers, PCCA (and not the Upstream

21  Source or other supplier) holds *direct* responsibility for the products it sells. The Regulations, as

22  applied, only serve to destroy PCCA's confidential business information and trade secrets, and

23  compel PCCA to make false and factually controversial statements, which mislead rather than

24  serve the public interest.

25          7.       Despite these constitutional infirmities, Defendants have made clear that they will

26  seek to vigorously enforce their unconstitutional interpretation of what entity qualifies as a

27  "manufacturer" under the Regulations, and will immediately bring enforcement proceedings

28  against PCCA and its pharmacy customers based on this flawed application of the Regulations.

1   This unlawful scheme places PCCA and its pharmacy customers at imminent risk of being subject

2   to enforcement proceedings brought on behalf of the Board, and ultimately at risk of being

3   sanctioned for violations of the Regulations.  As a wholesale distributor licensed by the Board,

4   PCCA is directly subject to the Board's authority.  In addition to causing direct and substantial

5   harm to PCCA's constitutional rights, PCCA will also suffer significant pecuniary harm when its

6   customer pharmacies—out of fear—cease purchasing products from PCCA.  Because PCCA faces

7   an imminent threat of such concrete and particularized injuries, it brings this Complaint for

8   Declaratory and Injunctive relief against the Defendants.

9                                        **PARTIES**

10          8.      Professional Compounding Centers of America, Inc. is a Texas corporation with its

11   headquarters in Houston, Texas. For over 40 years, PCCA has served as a leader in the

12   compounded drug industry and in the creation of personalized medicine and innovative solutions

13   to assist patients in need. PCCA sells to its customers (licensed compounding pharmacies) devices

14   and ingredients, including APIs.  Compounding pharmacies use PCCA ingredients to create

15   personalized, compounded medicines that cannot be obtained through traditional mass-produced

16   commercial drug products.  PCCA's ingredients are widely considered to meet the highest

17   standards in the compounded drug industry, and are trusted by compounding pharmacies to supply

18   safe and effective medicines to patients.

19          9.      PCCA is a manufacturer under California law. California Business and Professions

20   Code Section 4033 defines "manufacturer" to include "every person who prepares, derives,

21   produces, compounds, or repackages any drug." PCCA meets this definition through multiple

22   manufacturing activities, including by: producing compounding pharmaceutical ingredients

23   through testing , quality control, and certification procedures; repackaging bulk ingredients into

24   smaller quantities suitable for distribution to compounding pharmacies; and preparing

25   pharmaceutical ingredients for distribution through labeling, documentation, and quality assurance

26   processes.

27          10.     PCCA is a manufacturer under federal law. PCCA is registered with the FDA as a

28   drug establishment, identifying its business operations as "relabel" and "repack." PCCA also

engages in other operations with respect to the APIs and other drug ingredients it sells into California, further confirming that PCCA is a manufacturer under California and federal law. *See* 21 C.F.R. § 207.1.

11.    PCCA is subject to the Board's authority as a licensed nonresident wholesaler, as that term is defined by California Business and Professions Code Section 4043.  PCCA's license from the Board authorizes PCCA to ship its drugs to its customers in California.

12.    The California State Board of Pharmacy consists of 13 members. The Governor of the State of California appoints eleven members.  The remaining two members are appointed by the California Senate Rules Committee and the Speaker of the Assembly. Collectively, the members select an executive officer. The executive officer directs operations and oversees staff, including the California State Board of Pharmacy investigators.

13.    Anne Sodergren is the Executive Officer for the California State Board of Pharmacy, and maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

14.    Julie Ansel is the Deputy Executive Director of the California State Board of Pharmacy. Julie Ansel maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

15.    Seung Oh is the President of the California State Board of Pharmacy. Seung Oh was appointed by the Governor of California. Seung Oh maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

16.    Jessica Crowley is the Vice President of the California State Board of Pharmacy. Jessica Crowley was appointed by the Governor of California. Jessica Crowley maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

17.    Trevor Chandler is the Treasurer of the California State Board of Pharmacy. Trevor Chandler was appointed by the Governor of California. Trevor Chandler maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

18.    Renee Armendariz Barker is a Board Member of the California State Board of Pharmacy. Renee Armendariz Barker was appointed by the Governor of California. Renee

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1  Armendariz Barker maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento
2  California 95833.

3       19.    Kartikeya Jha is a Board Member of the California State Board of Pharmacy.
4  Kartikeya Jha was appointed by the Governor of California. Kartikeya Jha maintains an office at
5  2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

6       20.    Satinder Sandhu is a Board Member of the California State Board of Pharmacy.
7  Satinder Sandhu was appointed by the Governor of California. Satinder Sandhu maintains an
8  office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

9       21.    Maria D. Serpa is a Board Member of the California State Board of Pharmacy.
10  Maria D. Serpa was appointed by the Governor of California. Maria D. Serpa maintains an office
11  at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

12       22.    Nicole Thibeau is a Board Member of the California State Board of Pharmacy.
13  Nicole Thibeau was appointed by the Governor of California. Nicole Thibeau maintains an office
14  at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

15       23.    Jeanette Dong is a Public Board Member of the California State Board of
16  Pharmacy. Jeanette Dong was appointed by the California Speaker of the Assembly.  Jeanette
17  Dong maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

18       24.    Jeff Hughes is a Public Board Member of the California State Board of Pharmacy.
19  Jeff Hughes was appointed by the California Speaker of the Assembly.  Jeff Hughes maintains an
20  office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

21       25.    Claudia L. Mercado is a Public Board Member of the California State Board of
22  Pharmacy. Claudia L. Mercado was appointed by the California Speaker of the Assembly.
23  Claudia L. Mercado maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento
24  California 95833.

25       26.    Jason Newell is a Public Board Member of the California State Board of Pharmacy.
26  Jason Newell was appointed by the California Speaker of the Assembly.  Jason Newell maintains
27  an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

28       27.    Ricardo Sanchez is a Public Board Member of the California State Board of

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1  Pharmacy. Ricardo Sanchez was appointed by the California Speaker of the Assembly.  Ricardo

2  Sanchez maintains an office at 2720 Gateway Oaks Dr., Suite 100, Sacramento California 95833.

3  **THE UNCONSTITUTIONAL REGULATIONS**

4  28.   The challenged Regulations require compounding pharmacies to identify the name

5  of the "manufacturer . . . for each component" on the "compounding record" and ensure that

6  "[w]hen the [Certificate of Analysis ("COA")] is received from a supplier, it must provide the

7  name and address of the manufacturer." *See* Ex. A (highlighting relevant excerpts at 16 CCR

8  §§ 1735.7(c)(1), 1736.9(d), 1736.11(c)(2), 1738.9(b)(2),1738.11(b)).

9  29.   As applied to PCCA, these Regulations create an impossible constitutional

10  dilemma. The Board has made clear that it will not accept PCCA's identification of itself as the

11  "manufacturer" on COAs and compounding records, despite PCCA's status as a manufacturer

12  under both California and federal law. Instead, the Board demands that PCCA identify its

13  Upstream Sources as the "manufacturers."  Refusing to allow PCCA to identify itself as the

14  manufacturer and, instead, requiring PCCA to list an Upstream Source on its own COA would

15  provide compounding pharmacies with false, misleading, and factually controversial information,

16  and would require PCCA to disavow its role as a manufacturer when it *is* a manufacturer under

17  federal and California law.  At the same time, however, if PCCA's COAs and its customers'

18  compounding records do not satisfy the Board's interpretation of the Regulations, PCCA and its

19  customers will be subject to fines, penalties, and other enforcement actions from the Board. *See*

20  Cal. Bus. & Prof. Code §§ 4084(a), 4169(a)(3) and (b), 4301(g); Cal. Health & Safety Code

21  §§ 110290 and 111335.  Additionally, if the Board rejects PCCA's COAs and customers'

22  compounding records under the Regulations, the compounding pharmacies that currently purchase

23  ingredients from PCCA will be forced to source their important compound ingredients from other

24  companies, causing PCCA to lose business and market position.

25  30.   The Regulations, as applied, are in conflict with the Constitution of the United

26  States, and are therefore preempted, null and void.  The Regulations violate the First Amendment

27  because they compel false speech and restrict truthful speech of private actors.  The Regulations

28  compel PCCA to make false statements by requiring it to identify entities other than itself as the

"manufacturer" responsible for its products. Simultaneously, they restrict PCCA's truthful speech by prohibiting it from accurately identifying itself as the manufacturer of the pharmaceutical ingredients it procures, tests, repackages, stores, and distributes. The Regulations' effect, as applied to PCCA, also violates the Fifth Amendment. The Regulations effect a regulatory taking by forcing PCCA to disclose trade secrets—its carefully developed Upstream Sources—without just compensation. This disclosure destroys competitive advantages that PCCA has built through more than 40 years of investment in API source due diligence, facility audits, and quality control system. The Regulations' effect has the "character" of total interference with PCCA's confidential business information and trade secrets and results in devasting "economic impact" on PCCA by requiring disclosure of PCCA's confidential business information and trade secrets for which it has a reasonable investment-backed expectation of secrecy. Unless enjoined, the Regulations will violate PCCA's constitutional rights and inflict irreparable harm on PCCA's business.

31.     The Regulations serve no legitimate public purpose. Forcing PCCA to affix false, misleading or controversial information on its COA and other ingredient labeling does not serve the public. Further, PCCA is a manufacturer, under California and federal law, and the manufacturer responsible for recalls and adverse events related to products it sells to customers. The Regulations, as applied, only serve to destroy PCCA's trade secrets and compel PCCA to make false and factually controversial statements, which misleads rather than serves the public interest.

32.     Perversely, unless enjoined, the Board's decision to enforce the Regulations against PCCA will harm the residents of the State of California. PCCA's active pharmaceutical ingredients and other drug ingredients are considered to meet the highest standards in the industry. PCCA's rigorous due diligence into its global Upstream Sources and the in-depth testing PCCA itself conducts on ingredients obtained from those global Upstream Sources prior to relabeling and repacking sets it apart in the industry. As one compounding pharmacy informed the Board, "PCCA has a rigorous process to vet manufacturers, including that they are registered with and inspected by the U.S. Food and Drug Administration ("FDA"). Further, they have a process of validating their wholesaler's COAs and rejecting components that don't meet standards (even if

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1   the wholesaler's COA says its does)."  When a compounding pharmacy receives a PCCA-labeled

2   ingredient, it comes with the comfort and security of knowing that the ingredient used in a

3   patient's compounded drug is of the highest quality. By deeming these COAs and the

4   compounding records not compliant with the Regulations, the Board will force compounding

5   pharmacies serving California residents to purchase ingredients from other suppliers that might

6   not undergo such rigorous testing and extensive due diligence.  This, in turn, will negatively

7   impact patient safety.

8         33.   The Board's stated objective in promulgating the Regulations was to impose the

9   responsibility for monitoring a supplier's FDA compliance on the various compounding

10  pharmacies that purchase from that supplier.  As stated in the Board's response to public

11  comments, each individual compounding pharmacy "needs to have transparency into the supply

12  chain and awareness of the manufacturer (where the manufacturer and vendor are different)," and

13  "to respond appropriately in the event of a product recall."

14        34.   Imposing such a compliance obligation on each compounding pharmacy—many of

15  which are small organizations that are focused on providing necessary medications to their many

16  customers—would not increase safety or reliability, but would unduly burden these businesses

17  with the impossible task of becoming aware of recalls across the globe.  PCCA stands in the best

18  position to maintain the reliability and transparency of its supply chain, and if necessary, to

19  oversee recalls on behalf of its customers. Indeed, forced substitution of the Upstream Source as

20  the "manufacturer" on the COAs and other labeling, as the Board's application of the Regulations

21  require, would confuse and misdirect pharmacies away from contacting PCCA (often the sole

22  entity legally responsible for recalls).  In short, the Regulations do not accomplish the Board's

23  stated objectives; instead, the Regulations impose unrealistic burdens on compounding pharmacies

24  and threaten the ability of the supply chain to respond to a recall event.

25                                       **JURISDICTION AND VENUE**

26        35.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

27  the action arises under the Constitution and laws of the United States.

28        36.   PCCA has standing to bring this action because the Regulations directly target its

manufacturing and speech activities. The Regulations target PCCA's commercial speech and seek to compel disclosure of PCCA's confidential business information and trade secrets. Further, because PCCA is a licensed wholesale distributor, the Board will consider any COA it issues as a "manufacturer" to be false and subject to enforcement action as "unprofessional conduct" under Cal. Bus. & Prof. Code § 4301(g).

37.     This Court has authority to grant the requested relief under, *inter alia*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 42 U.S.C. § 1983, because the Regulations infringe upon PCCA's constitutional rights.

38.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because at least one defendant in this action resides in this judicial district, and because a substantial part of the events giving rise to PCCA's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**PCCA is a Manufacturer and a Supplier of Compound Ingredients**

39.     "Compounding is . . . a practice in which a licensed pharmacist . . . combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient." *See* Human Drug Compounding, FDA, available at https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding (last visited September 15, 2025).

40.     Compounding serves an important role for patients whose clinical needs cannot be met by commercially available over the counter or prescription drugs.  For example, compounding may be used when a patient is allergic to an ingredient or needs a different drug dosage strength than what is commercially available.  Compounding also allows patients with particular medical needs (*e.g.*, cannot swallow) to receive a drug in a different dosage form so that it can be delivered by alternative methods, such as topical creams, drops, or injections.

41.     Without compounded drugs, numerous patients throughout the United States, including in California, would be unable to receive the drugs they need to function, perform routine activities, or, even in some cases, survive.

42.     PCCA is not a compounding pharmacy. Rather, PCCA manufacturers and supplies bases, APIs and inactive ingredients (also called excipients) to its customers, licensed

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1   compounding pharmacies.

2       43.     PCCA is a manufacturer under California law. In California, the definition for

3   "manufacturer" broadly "includes every person who prepares, derives, produces, compounds, or

4   repackages any drug." Cal. Bus. & Prof. Code § 4033. PCCA meets this definition through

5   manufacturing activities, including but not limited to:

6           (a)     **Deriving** compounding pharmaceutical ingredients from the bulk APIs and

7                   other drug products it receives through comprehensive testing, quality

8                   control, and certification procedures;

9           (b)     **Repackaging** bulk ingredients into smaller quantities suitable for

10                  compounding pharmacy use; and

11          (c)     **Preparing** pharmaceutical ingredients for distribution through labeling,

12                  documentation, and quality assurance processes.

13      44.     PCCA is a manufacturer under federal law. PCCA is registered with the FDA as a

14  drug establishment, identifying its business operations as "relabel" and "repack".  FDA

15  regulations state that the definition of "manufacture" includes "manipulation, sampling, testing, or

16  control procedures applied to the final product or to any part of the process, including, for

17  example, analytical testing of drugs for another registered establishment's drug." *See* 21 C.F.R.

18  § 207.1. These activities are also considered part of the actions that constitute "prepares, derives,

19  [and] produces" under California law.  *See* Cal. Bus. & Prof. Code § 4033.

20      45.     PCCA engages in operations with respect to APIs and other drug ingredients it sells

21  into California such that it qualifies as a "manufacturer" under California and federal law.  Beyond

22  simple repackaging, PCCA engages in several sophisticated manufacturing processes, including:

23  (1) conducting comprehensive testing of all ingredients against established specifications; (2)

24  performing identity verification, purity analysis, and safety testing; (3) issuing COAs based on

25  PCCA's own testing results, not merely wholesale supplier COAs; (4) maintaining direct control

26  over suppliers through periodic facility audits and quality assessments; and (5) rejecting products

27  that fail to meet PCCA's standards, even when wholesale supplier COAs indicate compliance.

28  These activities fall within the definition of "manufacturer" under both federal and California law.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

46.    Under PCCA's Quality Agreements with its Upstream Sources, PCCA is the primary point of contact and bears primary responsibility for coordinating recalls and field alert activities related to the APIs and compounding pharmaceutical ingredients supplied to pharmacies, including those in California. PCCA maintains the traceability records, lot-level distribution data, and customer communications infrastructure necessary to execute recalls efficiently at the pharmacy level.

47.    While some of PCCA's Upstream Sources are under a legal obligation to conduct recalls, not all of PCCA's Upstream Sources are within the reach of California and federal enforcement where a recall would be deemed legally necessary. Therefore, substitution of the Upstream Source as the "manufacturer" on the COAs and other labeling, as the Board's application of the Regulations require, would confuse and misdirect pharmacies away from contacting PCCA, who may be the sole entity legally responsible for recalls. This will have the effect of delaying communications to PCCA and otherwise complicating recall effectiveness. False or confusing identification of the "manufacturer" on the COA and labeling undermines recall coordination. Such confusion during a medical emergency would not enhance public safety, but instead, undermine it.

48.    The FDA does not require PCCA to disclose its Upstream Sources on its COAs and labeling. In 2019, the FDA initiated an enforcement action beginning with a Form FDA-483, "Inspectional Observations," which requested disclosure of PCCA's Upstream Sources on its COAs. PCCA provided a detailed response raising objections that included PCCA's constitutional and trade secret concerns, arguing that PCCA's compliance methods obviated the need for such disclosure. In 2023, the FDA closed the enforcement action without requiring any such Upstream Source disclosure, thereby confirming that the FDA accepted PCCA's alternative approach.

49.    Although the Board relies on the FDA, California stands alone in requiring upstream ingredient sources disclosure on COAs. Neither the FDA nor any other state other than California has determined that such disclosure on a PCCA COA serves public health purposes.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

**PCCA Confidential Upstream Source Due Diligence**

50.     PCCA has spent significant resources authenticating, sourcing, and testing its Upstream Sources and their products.  If the names of the Upstream Sources were known by PCCA's competitors or customers, they would be able to source directly from those suppliers with the knowledge that PCCA has already exhaustively established the quality of their APIs and drug ingredients.

51.     PCCA has established standards and procedures through which it conducts due diligence on its Upstream Sources.  Among other things, PCCA requires that its Upstream Sources be inspected by FDA or another recognized authority, or be audited by PCCA or PCCA's third-party auditor.

52.     Although PCCA's Upstream Sources provide their own COAs, PCCA does not blindly rely on those COAs before supplying the API to its customers.  Even after PCCA certifies an Upstream Source for purchase, PCCA further vets and authenticates the procured APIs through its own testing.

53.     PCCA tests "each unique API and USP verified packaging components . . . manufacturer lot number" procured against set specifications to confirm the ingredient's identity and safety.

54.     When a product is found to be unfit for distribution, PCCA rejects the product. And PCCA communicates its test results on the COA it provides to licensed compounding pharmacies.

55.     The Board was informed during the Regulations' comment period by one of PCCA's customers that "PCCA has a process of validating their wholesaler's COAs and rejecting components that don't meet standards (even if the wholesaler's COA [to PCCA] says it does)."

56.     Since 1981, PCCA has diligently identified and qualified a critical network of Upstream Sources to ensure the products are from sources that meet PCCA's proprietary quality assessment standards and testing.  PCCA continues to conduct due diligence of these sources to ensure that they consistently provide the highest quality ingredients that satisfy PCCA's testing and analysis.

57.      Under California and Federal law, PCCA's list of Upstream Sources that it compiled through extensive due diligence, and which provides PCCA with a competitive advantage, is considered a trade secret. Absent PCCA providing the names of its Upstream Sources, such information is not readily available.

58.      "[A] trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources. Expressed differently, a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret." *Logistics Guys Inc. v. Cuevas*, No. 2:23-CV-01592-DAD-CSK, 2024 WL 3011216, at *6 (E.D. Cal. June 13, 2024) (citing *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016)).

59.      Under California law, if the Board compelled PCCA to disclose its Upstream Sources to the Board, the Board would be precluded from further distributing the information or making such information public. For example, under the California Public Records Act, Cal. Gov. Code §§ 6250 et seq., California cannot release certain proprietary information to the public, including corporate records and trade secrets relating to food, drugs, and cosmetics. Cal Gov. Code §§ 6254.15, 6276.44.   Notwithstanding that significant swaths of information are available for public disclosure, "corporate proprietary information including trade secrets" is specifically exempt from disclosure by Cal. Gov. Code § 6254.15.  Further, the California Health and Safety Code precludes the State from "reveal[ing] . . . any information acquired . . . concerning any method of process which as a trade secret is entitled to protection." Cal. Health & Safety Code § 110165. Notwithstanding California's recognition of the legitimate public interest in protecting trade secrets, the Board's planned enforcement of the Regulations seeks to do what California law prohibits—that is, publicly disclose PCCA's Upstream Sources.

60.      Forced disclosure of these trade secrets will destroy PCCA's competitive advantages. Once PCCA's Upstream Source relationships become public through COA and labeling disclosures, several negative repercussions will necessarily occur. Competitors, or even customers, will be able to source directly from PCCA's Upstream Source without investing in their own due diligence. PCCA will lose a competitive advantage it has built up over 40 years in the development of its Upstream Sources.  The value of PCCA's quality assurance and supplier

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1  expertise will be diminished.  And PCCA's market position and pricing power will be

2  permanently impaired.

3        61.    PCCA has taken necessary steps to protect its trade secrets from disclosure.  This

4  includes asserting its rights to maintain its trade secrets from disclosure from regulatory bodies,

5  including the FDA.  For example, when investigators for the Board have previously requested that

6  compounding pharmacies disclose PCCA's Upstream Sources, the compounding pharmacies

7  inform PCCA of the request.  PCCA then provides the information directly to the Board

8  investigators under the protection of Federal and California law preventing further disclosure.

9        62.    Defendants have been advised that PCCA's Upstream Source information

10  constitutes trade secrets protected by federal and state law.  Defendants' historical practice of *not*

11  publicly releasing the identities of the Upstream Sources that PCCA has disclosed to the Board's

12  investigators confirms that Defendants are aware of the protected status of this information.

13                **Regulatory History and Industry Opposition to Regulations**

14        63.    On December 20, 2023, the Board issued a notice of proposed regulatory action

15  regarding changes to Title 16, Division 17 of the California Code of Regulations.  Among other

16  articles, the Board proposed revisions to articles 4.5, 4.6, 4.7, and 4.8. *See* Ex. A.

17        64.    Among the proposed revisions, the Board sought to require compounding

18  pharmacies to document "[t]he manufacturer . . . for each component" on a document called the

19  "compounding record."  *See id*.

20        65.    Additionally, the Board proposed revisions requiring compounding pharmacies to

21  ensure the "name and address of the manufacturer" is on "the [Certificate of Analysis]" received

22  with the APIs. ("COA Requirement"). *See id.*

23        66.    The Board initially stated that this new COA Requirement was warranted "in

24  accordance with the requirements of the FDCA (section 503A(b)(1)(A)(iii)) and further elaborated

25  on in the guidance document - Pharmacy Compounding of Human Drug Products Under Section

26  503A of the Federal Food, Drug, and Cosmetic Act, issued by the FDA."  Specifically, the Board

27  said that "[o]btaining and retaining this document ensures that the API is coming from an FDA-

28  registered facility, which means the facility has been inspected by the FDA for good

1  manufacturing practices and that the API was manufactured under an appropriate system for

2  managing quality."

3      67.    On July 31 through August 1, 2024, the Board held a public board meeting. The

4  Board meeting notes reflect the Regulations' "requirement that the COA include the

5  manufacturer's name and address" was raised by those in attendance. The Board minutes state the

6  Board "clarified that this requirement derives from the FDA's guidance about the need to know

7  bulk suppliers."

8      68.    On November 6 and 7, 2024, the Board held another public board meeting.  Prior to

9  the meeting, the Board gathered and responded to industry and public comments.

10     69.    Prior to the meeting, the National Community Pharmacists Association ("NCPA")

11  submitted comments relaying concerns regarding the COA Requirement and basis.  The NCPA

12  stated:

13          Neither the FDCA nor any FDA implementing regulation—or even a non-binding
            guidance document—includes a "requirement for the COA" from a supplier to
14          disclose an original manufacturer's identity. The proposed rules point to FDCA to
            support the proposed rules and yet the FDCA does not support the proposed rules.
15          The FDCA and its implementing regulations set forth a single requirement for
            COAs: Compounded drugs must be accompanied by valid COAs for their bulk
16          drug substances to qualify for exceptions to the FDCA. 21 U.S.C.
            §§ 353a(b)(1)(a)(iii), 353b(a)(2)(D) (both requiring compounded drug products to
17          be "accompanied by valid certificates of analysis for each bulk drug substance").

18

19  *See* Ex. B at 1 (regarding § 1735.7(c)(2)).

20     70.    The NCPA also raised concerns that the COA Requirement requiring the disclosure

21  of downstream manufacturers would require the disclosure of confidential business information

22  and trade secrets. The NCPA stated:

23          There are also concerns that the compelled disclosure of original manufacturer . . .
            information would force revelation of trade secrets. Indeed, for a supplier, the
24          identity of the original manufacturer of API and excipients represents confidential
            commercial information, and the state cannot compel disclosure of such
25          information. . . . There is no question that the federal government—specifically
            FDA—considers and understands this information to be confidential and thus
26          treats it as such. In Form FDA 483s and in Warning Letters that FDA posts on its
            website, FDA redacts the identity of the original manufacturer of API for use in
27          compounding under the federal Freedom of Information Act exemption (b)(4)
            because it is "confidential commercial information." [citations omitted]

28

1  *See id.*

2     71.    Additionally, prior to the November 2024 Board meeting, A.J. Day, Chief

3  Executive Officer of Wilcrest Pharma and former Vice President of Clinical Services at PCCA,

4  raised concerns that the COA Requirement would violate companies "proprietary trade secret

5  information [that California law] protects from disclosure." *See id.* at 2 (regarding § 1735.7(c)(2)).

6     72.    The staff for the Board responded to the public comments but did not recommend

7  any changes.  In declining to make any changes to the Regulations, the staff stated:

8      Staff note that while existing law provides flexibility to record the manufacturer
       under limited circumstances, continuation of the current provision is not
9      appropriate as it hampers the ability of a facility to respond appropriately in the
       event of a product recall. . . . Staff note that the Chapter requires either the
10     recording of the manufacturers or vendor; however, in separate guidance issued
       by the FDA, the facility needs to have transparency into the supply chain and
11     awareness of the manufacturer (where the manufacturer and vendor are different.)
       The FDA has released guidance in this area, including the importance of a
12     compounders knowing your suppliers - - https://www.fda.gov/drugs/human-drug-
       compounding/fda-compounders-know-your-bulks-and-excipients-suppliers.
13     Lastly, simply identifying the manufacturer of a component without more does
       not appear to be requiring the disclosure of a trade secret under Civil Code section
14     3426.1(d).
15
16 *See id* at 1-2.

17     73.    On January 8, 2025, the Board held a public meeting where concerns regarding the

18 Regulations' COA Requirement were once again raised.  Prior to the meeting, the Alliance for

19 PHY Compounding submitted their concerns that the Regulations' COA Requirement violated

20 trade secret laws, stating in part:

21     Additionally, not all wholesalers or repackagers include the original manufacturer
       name or address on the COA, as they assert that is a trade secret. Trade secrets
22     should be protected under California law. Per the Civil Code, "Trade secret"
       means information, including a formula, pattern, compilation, program, device,
23     method, technique or process that (1) derives independent economic value, actual
       or potential, from being generally known to the public or to other persons who
24     can obtain economic value from its disclosure or use, and (2) is the subject of
       efforts that are reasonable under the circumstances to maintain its secrecy. Some
25     pharmacy vendors maintain that the manufacturers they source API from is a
       trade secret and disclosure would cause economic injury.
26
27 *See* Ex. C at 1 (regarding § 1736.9(d)).

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

74.     The response from the Board's staff to the legitimate public objections raised in advance of the January 2025 public meeting mirrored its earlier responses, and again, the Board did not make any changes to the Regulations.

75.     On February 5 and 6, 2025, the Board held another public meeting.  Prior to the meeting, the Board received additional public comments and concerns regarding the COA Requirement, including multiple comments that the Regulations, as the Board intended to apply them, would violate PCCA's trade secrets.

76.     Prior to the February meeting, Marie Cottman, Pharm.D., and owner of Pacific Compounding Pharmacy commented on the COA Requirement as it relates to PCCA.  Ms. Cottman stated that the Board's "inspectors are aware that PCCA will not provide original COA nor reveal the manufacturer, except when requested by a Board Inspector."  Further, Ms. Cottman stated that "PCCA has a rigorous process to vet manufacturers, including that they are registered with the FDA. Further, they have a process of validating their wholesaler's COAs and rejecting components that don't meet standards (even if the COA says it does)."

77.     Additionally, prior to the February meeting, PCCA submitted comments to the Board and raised four primary concerns. *See* Ex. D.

78.     First, the Regulations' COA Requirement would require the disclosure of PCCA's protected business information and trade secrets.  As PCCA stated, the identity of PCCA's Upstream Sources "holds significant value because disclosing the identity of carefully sourced suppliers would grant competitors a substantial and unfair business advantage. PCCA and other similar businesses, have invested heavily in developing relationships with manufacturers, performing rigorous vetting processes, and ensuring compliance with stringent quality standards. Public disclosure of this information would undermine these efforts and expose suppliers' business models to harm." *See id.*

79.     Second, PCCA pointed out that, notwithstanding the Board's asserted purposes, "[n]either the FDCA nor FDA regulations impose any obligation to include the manufacturer's information on a COA. Instead, the FDA has long accepted the practice of suppliers providing COAs that incorporate quality testing data from the suppliers themselves as well as data from the

1    manufacturer's own quality testing." *See id.*

2        80.    Third, PCCA pointed out that the FDA guidance that the Board referenced was

3    only a recommendation based on Good Manufacturing Practices in compounding ("cGMP") and

4    was not a legal or regulatory requirement in line with actual FDA application and practice. In fact,

5    "the FDA has recognized that requiring manufacturer information is not necessary to meet the

6    requirements of Section 503." *See id.*

7        81.    Fourth, PCCA informed the Board about the negative impacts resulting from the

8    COA Requirement. "Mandating the inclusion of manufacturer information on COAs, as proposed

9    . . . , would impose unnecessary burdens on compounding pharmacies and suppliers alike. The

10   harmful consequences of the proposed regulations include (1) exposing proprietary sourcing

11   strategies—which are considered trade secrets—in violation of California law, and (2) a regulation

12   that diverges from federal standards and guidance, creating unnecessary confusion and

13   inconsistency for suppliers and compounding pharmacies operating across multiple jurisdictions."

14       82.    Notwithstanding these legitimate and compelling concerns, the Board did not

15   change the proposed COA Requirement language.   The Board staff reiterated the same reasons it

16   had previously advanced for the COA Requirement, and the Board staff added that, "vendors[, like

17   PCCA,] can take steps when contracting with compound [pharmacies] to protect the information

18   related to their business arrangements with manufacturers."  As such, the Board admitted that its

19   purpose in promulgating the Regulations was *not* to promote transparency as to California

20   residents and patients. At best, the Board's purpose appears to be the forceable disclosure of

21   PCCA trade secrets to its customers and competitors, which still constitutes an unconstitutional

22   taking.

23       83.    On March 26, 2025, the Board rejected the proposed amendments and objections to

24   the Regulations raised by PCCA and other commentors, and adopted the Regulations.

25       84.    On June 19, 2025, the Board filed the signed Regulations with the California

26   Secretary of State, and stated that the Regulations would be effective and binding on all regulated

27   pharmacies in California on October 1, 2025.

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

**Immediate and Irreparable Harm to PCCA Starting October 1, 2025**

85.    The Board has informed PCCA and its customers that it will require the disclosure of PCCA's Upstream Source on the COAs issued by PCCA and will not otherwise accept PCCA as the "manufacturer," even though PCCA is a manufacturer under California and federal law.

86.    Once the Regulations go into effect the Board will train and instruct its inspectors to target PCCA's customers for inspection, and direct them to find violations of the Regulations where COA and compounding records identify PCCA as the "manufacturer."

87.    If the Board and its investigators enforce the Regulations in such a way as to refuse to accept COAs and compounding records listing PCCA as the manufacturer, PCCA will lose customers and market position.  Indeed, customers have already notified PCCA they will be forced to switch to a PCCA competitor if the Board refuses to accept PCCA COAs.

88.    Additionally, the Board's unconstitutional enforcement of the Regulations has the potential for it to find PCCA liable for providing noncompliant COAs and labeling. For instance, the Board may allege that PCCA's drugs are "misbranded" because the labeling and COAs identify PCCA (and not the Upstream Source) as the manufacturer.  *See* Cal. Health & Safety Code §§ 110290 and 111335.  Such a finding could subject such drugs to an embargo under Cal. Bus. & Prof. Code § 4084(a), and PCCA itself could be subject to a fine for selling misbranded drugs under Cal. Bus. & Prof. Code § 4169(a)(3) and (b).

89.    Therefore, if the Regulations are enforced as the Board has threatened, PCCA (1) faces immediate and imminent constitutional injury, (2) will suffer immediate, irreparable and permanent harm and damage to its market position and reputation, and (3) patients in the State of California, who rely upon pharmacies receiving the highest quality ingredients for their compounded drugs, will be harmed.

**CLAIMS FOR RELIEF**

**Count 1**
**For Declaratory Relief And Injunctive Relief**
**Based Upon Violation of The First Amendment – Unlawful Restraint of Speech**

90.    Paragraphs 1 through 89 above are incorporated by reference.

91.    The First Amendment of the United States Constitution provides that "Congress

1  shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The Fourteenth

2  Amendment of the United States Constitution made the First Amendment applicable to the States,

3  including California. *See id.*, amend. XIV.

4          92.     The First Amendment protects restrictions on speech and provides protections

5  against the government compelling individuals or entities to engage in speech.

6          93.     Under the First Amendment, laws compelling speech ordinarily receive strict

7  scrutiny. *See Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977). Laws regulating commercial

8  speech generally receive at least intermediate scrutiny, which prohibits restraints on speech that

9  are not directly and materially advancing the government's interest, or are more extensive than

10  necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

11  Laws that require disclosure of information in connection with commercial transactions are also

12  permissible only if the compelled disclosure is of information that is purely factual,

13  uncontroversially accurate, reasonably related to a substantial government purpose, and not unduly

14  burdensome or chilling. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

15          94.     PCCA reasonably believes it is a manufacturer in fact and under the law.

16          95.     California defines a "manufacturer" to "includes every person who prepares,

17  derives, produces, compounds, or repackages any drug or device except a pharmacy that

18  manufactures on the immediate premises where the drug or device is sold to the ultimate

19  consumer." Cal. Bus. & Prof. Code § 4033(a)(1).

20          96.     PCCA meets the definition manufacturer as it "derives, produces, . . . [or]

21  repackages" APIs it supplies to customers.

22          97.     PCCA is responsible for providing the COA to compounding pharmacies

23  purchasing its APIs, including in California.

24          98.     The Regulations, as applied, seek to prohibit PCCA from stating it is a

25  manufacturer on its COAs and labeling.

26          99.     The Regulations, as applied to PCCA, compel speech that is false and misleading,

27  and speech that is factually controversial.

28          100.    Because the Board's application of the Regulations to PCCA would compel speech

Barnes &
Thornburg LLP
Attorneys At Law
San Diego

21

that is false, misleading, or factually controversial, it cannot survive any level of constitutional scrutiny. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their products.").

101.     Further, the Regulations, which prohibit suppliers who are also manufacturers from stating they are the manufacturer on their COAs and labeling, would not survive intermediate scrutiny even if it were assessed under the comparatively less exacting standards that apply to commercial speech restrictions. *See Cent. Hudson Gas. Elect. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-65 (1980).

102.     The Regulations fail under any level of constitutional scrutiny applicable to First Amendment commercial speech.

103.     The Regulations are not narrowly tailored. Less restrictive alternatives exist, such as requiring disclosure to regulators rather than public disclosure

104.     The Regulations are more extensive the necessary. The Regulations go beyond any legitimate regulatory need by forcing the disclosure of trade secrets to third parties.

105.     The Regulations' mandate that COAs contain the "name and address of the manufacturer," as applied, constitutes impermissible compelled speech under the First Amendment.

106.     The Regulations, as applied by the Board, subject PCCA to fines, penalties, or other enforcement action if PCCA does not provide false, misleading and factually controversial COAs and labelling to its customers. *See* Cal. Bus. & Prof. Code §§ 4084(a), 4169(a)(3) and (b), 4301(g).

107.     As a direct and proximate result of Defendants' actions under color of state law, Plaintiff will suffer irreparable harm, thereby entitling PCCA to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

### Count 2
**For Injunctive and Declaratory Relief**
**Based Upon the Violation of the Fifth Amendment – Takings Clause**

108.     Paragraphs 1 through 107 above are incorporated by reference.

109.    The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment of the United States Constitution made the Fifth Amendment applicable to the States, including California. *See id.*, amend. XIV.

110.    The effect of the Regulations, as applied to PCCA, constitutes a regulatory taking in violation of the Takings Clause of the Fifth Amendment.

111.    The Regulations have the "character" of a total interference with PCCA's property rights in its trade secrets.

112.    Eliminating trade-secret protections for PCCA's confidential list of Upstream Sources will have a significant and devasting "economic impact" on PCCA's market position in California, throughout the United States, and globally.

113.    PCCA invested significant resources to diligently identify and qualify a critical network of Upstream Sources with the reasonable "investment-backed expectation" that its confidential and proprietary information will remain a secret. PCCA investment-backed expectations that its trade secrets would remain confidential is reasonable because (1) California and federal law specifically protects confidential business information and trade secrets, such as PCCA's Upstream Sources, from disclosure; (2) the pharmaceutical industry, including the actions of the Board and the FDA, recognizes relationships as confidential business information; and (3) PCCA invested substantial resources in developing these trusted Upstream Sources with the expectation of maintaining competitive advantages and successfully maintained confidentiality for over 40 years.

114.    The Regulations' mandate that COAs contain the "name and address of the manufacturer," as applied, destroys valuable trade secrets without any compensation, let alone just compensation, constituting an impermissible taking under the Fifth Amendment. U.S. Const. amend. V.

115.    As there is no state law means to obtain compensation for PCCA's loss in market position globally, injunctive relief is the only available and proper remedy.

116.    As a direct and proximate result of Defendants' actions under color of state law, Plaintiff will suffer irreparable harm, thereby entitling PCCA to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

### Count 3
**For Declaratory Relief Based Upon the Declaratory Judgment Act**
**(28 U.S.C. §§ 2201-2202)**

117.    Paragraphs 1 through 116 above are incorporated by reference.

118.    Under 28 U.S.C. § 2201, in a case of "actual controversy within its jurisdiction," "any court of the United States . . . may declare the rights and other legal relations of any party seeking such declaration."

119.    PCCA brings an actual controversy within the jurisdiction of this Court because it will be injured as a direct result of Defendants', as applied, enforcement of the Regulations.

120.    PCCA is directly subject to, and in fact target of, the Regulations as the entity responsible to identify the "manufacturer" of the ingredients on the COAs and labeling provided to compounding pharmacies.

121.    The Regulations become effective October 1, 2025, creating imminent enforcement.

122.    The Board and its investigators have made clear it will enforce the Regulations against PCCA by refusing to accept as satisfactory under the Regulations PCCA listing its name and address as the "manufacturer."

123.    PCCA faces immediate constitutional injury and business harm.

124.    PCCA has a right not to be subject to government action that is contrary to the law.

125.    The Regulations violate PCCA's rights because they conflict with the United States Constitution.

126.    Therefore, PCCA is entitled to declaratory judgment that the Regulations are contrary to law and cannot be enforced.

127.    A declaratory judgment will provide certainty about the parties' rights and obligations, allowing PCCA to continue its operations without the threat of having its constitutional rights violated or facing regulatory penalties or fines.

128.     PCCA seeks a declaration stating that: (1) PCCA is a "manufacturer" pursuant to the Regulations; (2) PCCA's designation of itself as the manufacturer on the its COAs and labeling would not violate the Regulations; (3) if the Board refuses to allow PCCA to call itself a "manufacturer" under the Regulations, and forces PCCA to identify another party as the "manufacturer" of its products, such application of the Regulations would constitute compelled speech in violation of the First Amendment to the Constitution of the United States; (4) if the Board compels PCCA to disclose the name and address of its Upstream Sources on its COAs, it would effect a regulatory taking in violation of the Fifth Amendment to the Constitution of the United States; and (5) the planned enforcement of the Regulations by the Board against PCCA and its customers is unconstitutional.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

A. Issue an order granting preliminary injunctive relief in favor of PCCA and against Defendants, such that Defendants are prohibited from enforcing the Regulations in a way that (1) prohibits PCCA from declaring itself as the manufacturer on PCCA issued COAs to satisfy the Regulations, (2)  prohibits or penalizes PCCA's customers for relying on PCCA-issued COAs and labeling that identify PCCA by name and address as the manufacturer, or (3) requires PCCA to identify its Upstream Source on the COAs PCCA issues;

B. Issue an order granting permanent injunctive relief in favor of PCCA and against Defendants, such that Defendants are prohibited from enforcing the Regulations in a way that  (1) prohibits PCCA from declaring itself as the manufacturer on PCCA COAs to satisfy the Regulations, (2)  prohibits or penalizes PCCA customers for relying on PCCA-issued COAs and labeling that identify PCCA by name and address as the manufacturer, or (3) requires PCCA to identify its Upstream Source on the COAs PCCA issues;

C. Declare the Regulations, as applied, are unconstitutional and may not be implemented;

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

D.  Declare PCCA's Upstream Sources and other suppliers are confidential trade secrets, the disclosure of which would cause PCCA to lose market position and customers, for which no just compensation exists;

E.  Award PCCA its cost and expenses; and

F.  Award such further and additional relief as is just and proper.

Dated:  September 26, 2025                    **BARNES & THORNBURG LLP**


By:    _____*/s/ Amy C. PoyerT*_____
Eric J. Beste
Amy C. Poyer
Mark Crandley (*pro hac vice forthcoming*)
David A. Frazee (*pro hac vice forthcoming*)
Attorneys for the Plaintiff
PROFESSIONAL COMPOUNDING CENTERS
OF AMERICA, INC.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO